# United States Court of Appeals
## For the First Circuit

Nos. 09-2468; 09-2493

ANTHONY BUCCI,
Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,
Respondent, Appellee.

---

DAVID JORDAN,
Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,
Respondent-Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

---

Before
Thompson, Selya, and Dyk,[*]
Circuit Judges.

---

Inga L. Parsons for petitioner-appellant Anthony Bucci.
David J. Nathanson, with whom Wood & Nathanson, LLP was on brief, for petitioner-appellant David Jordan.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for respondent-appellee the United States of America.

---

October 13, 2011

---

[*]Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  Anthony Bucci ("Bucci") and David Jordan ("Jordan") were jointly tried and convicted of drug-related crimes.  Each appeals from the district court's denial of his 28 U.S.C. § 2255 petition for collateral relief.  Both appellants contend that their Sixth Amendment right to a public trial was violated by a partial courtroom closure that occurred during jury selection; and that an improper delegation of Article III authority occurred because issues regarding the courtroom closure were determined by the clerk rather than by the judge.  The appellants alternatively contend that they are entitled to new § 2255 hearings because Bucci was not permitted to attend the hearing below (although he was represented by counsel); and Jordan was neither permitted to attend nor was he provided with appointed counsel at that time.  Finally, Bucci additionally asserts various claims of prosecutorial misconduct.

We affirm the district court's denial of Bucci's § 2255 petition.  However, we conclude that Jordan is entitled to a new § 2255 hearing.  We accordingly vacate the district court's denial of Jordan's petition and remand Jordan's case for further proceedings.

## I. Background

"We recite the pertinent facts in the light most favorable to the verdict[s] . . . ."  United States v. Downs-Moses, 329 F.3d 253, 257 (1st Cir. 2003).  The facts are described in greater detail in this court's opinion on the petitioners' direct

appeals, United States v. Bucci, 525 F.3d 116 (1st Cir. 2008), and in the district court opinion in the § 2255 proceedings, Bucci v. United States, 677 F. Supp. 2d 406 (D. Mass. 2009).

The underlying case involved the robbery of a cocaine dealer, Carlos Ruiz ("Ruiz"), by a group that included three other drug dealers, Bucci, Jon Minotti ("Minotti"), and Francis Muolo ("Muolo"), and a corrupt police officer, Jordan. The group devised a plan to rob Ruiz of three kilograms of his cocaine by setting up a fake drug transaction between Bucci and Ruiz, with Minotti acting as the middleman. The plan called for officer Jordan to arrive and pretend to "bust" the drug deal, providing Minotti an opportunity to escape with the drugs. Muolo was to be Minotti's getaway driver.

On December 24, 2003, Minotti accompanied Ruiz to the parking lot of the Malden Medical Center, where they met Bucci. Bucci agreed to purchase three kilograms of cocaine from Ruiz. As Minotti, the middleman, went to transfer the cocaine from Ruiz's car to Bucci's car, officer Jordan entered the parking lot in an unmarked vehicle, exited his car wearing plain clothes, shouted "Malden Police," and pointed a gun at Ruiz's head. Minotti immediately fled with all three kilograms of cocaine, traveling down an embankment and through the neighboring woods to where Muolo was waiting with a getaway car. Jordan frisked Ruiz and Bucci, detained them long enough for Minotti to complete his escape, and

-3-

then released them with a warning. Muolo, Minotti, and Bucci then reunited at Muolo's apartment to divide the proceeds from their heist. However, unbeknownst to them, Ruiz had been the subject of an ongoing federal investigation, and Drug Enforcement Administration ("DEA") agents conducting surveillance observed the foregoing events as they occurred.

On July 6, 2004, a federal grand jury returned an eight-count indictment charging Bucci and Jordan with, among other things, conspiracy to distribute cocaine, 21 U.S.C. § 846, possession of cocaine with intent to distribute, Id. § 841(a)(1), and possession of a firearm in connection with a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). Minotti and Muolo agreed to plead guilty to the same charges and to testify against Bucci and Jordan in exchange for lesser sentences. On April 12, 2006, a jury convicted Bucci and Jordan of all counts. This court affirmed their convictions and sentences. See Bucci, 525 F.3d at 134.

In May 2009, both Bucci and Jordan filed petitions seeking collateral relief under 28 U.S.C. § 2255. Following a three-day evidentiary hearing, the district court denied both petitions. See Bucci, 677 F. Supp. 2d at 420. Bucci and Jordan both appealed, and we consolidated their cases. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

When a district court has held an evidentiary hearing on a petitioner's § 2255 claim, "we review its factual conclusions for

clear error." Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007). We review the district court's legal conclusions de novo. Parsley v. United States, 604 F.3d 667, 671 (1st Cir. 2010).

## II. Bucci's Right to a Public Trial

We consider first Bucci's claim regarding the partial courtroom closure that took place during jury selection, summarizing existing law and then turning to the facts of this case.

### A.

The Supreme Court made clear in Waller v. Georgia, 467 U.S. 39, 46 (1984), that the Sixth Amendment guarantees criminal defendants the right to a trial that is open to members of the public. This right was "created for the benefit of the defendant," as openness in criminal proceedings "encourages witnesses to come forward," "discourages perjury," and "ensure[s] that judge and prosecutor carry out their duties responsibly." Id. (internal quotation mark omitted). Closure of a trial can be justified only by an overriding interest, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Id. at 45. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." Id. In Waller, the Supreme Court provided a four-part standard for courts to apply prior to excluding the public from any stage of a criminal trial:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> [2] the closure must be no broader than necessary to protect that interest,
>
> [3] the trial court must consider reasonable alternatives to closing the proceeding, and
>
> [4] it must make findings adequate to support the closure.

Id. at 48.

The situation in Waller involved a suppression hearing regarding the admissibility of wiretap evidence. Id. at 41-42. The trial court closed the courtroom to all members of the public during the entire seven-day suppression hearing. Id. at 42, 48. The state sought to justify the closure on the grounds that a public trial would impinge upon the privacy rights of non-defendants whose conversations were also captured in the wiretap recordings, and that unnecessary publication of the evidence might render it inadmissible under state law. Id. at 41, 48. The Supreme Court reversed. The Court reasoned that, "[u]nder certain circumstances, these interests may well justify closing portions of a suppression hearing," but the trial court had not adequately justified the closure in this case. Id. at 48-49. The Supreme Court further held that such Sixth Amendment violations constitute structural error for which "the defendant should not be required to prove specific prejudice in order to obtain relief," because "the

benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance." Id. at 49 & n.9.[1]

The Supreme Court recently made clear that the Sixth Amendment right to a public trial extends to "any stage of a criminal trial," including "the voir dire of prospective jurors." Presley v. Georgia, 130 S. Ct. 721, 724 (2010); see also Owens v. United States, 483 F.3d 48, 66 (1st Cir. 2007). In Presley, the trial judge excluded the defendant's uncle, the only spectator present at the time, from the courtroom during jury selection. Presley, 130 S. Ct. at 722. The defendant's counsel objected, but the trial court explained that, given the size of the jury pool, "[t]here just isn't space for [the public] to sit in the audience," and the "uncle cannot sit and intermingle with members of the jury panel." Id. (first alteration in original) (internal quotation marks omitted).

After Presley was convicted, he moved for a new trial and presented evidence showing that prospective jurors could have been accommodated in the jury box and one half of the courtroom, leaving the other half of the courtroom open for public seating. Id. The

---

[1] See also United States v. Gonzalez-Lopez, 548 U.S. 140, 148-49 & n.4 (2006) (noting that "structural defects" such as the denial of the right to public trial "defy analysis by 'harmless-error' standards because they affec[t] the framework within which the trial proceeds, and are not simply an error in the trial process itself") (alteration in original) (internal quotation marks omitted).

trial judge denied the motion, expressing concern that "family members [might have] intermingle[d] with the jurors."  Id.

The Supreme Court reversed Presley's conviction, finding that it was "well settled" under the Court's precedents that the Sixth Amendment right to a public trial applied to jury selection. Id. at 723-24.  In applying the Waller test, the Court concluded that

> [t]he generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of jurors.  If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course.

Id. at 725.  The Court also concluded that the trial court did not "consider all reasonable alternatives to the closure," stating:

> Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. . . .  Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.

Id.

Both Waller and Presley involved total courtroom closure situations where all members of the public were excluded during some phase of the trial.  See Presley, 130 S. Ct. at 722; Waller,

-8-

467 U.S. at 42.[2]  In partial closure cases--i.e., where courtroom access is restricted but some members of the public are permitted to attend--this court and several of our sister circuits have held that a "substantial" interest, rather than a "compelling" one, will justify partial closure.  United States v. DeLuca, 137 F.3d 24, 32-35 (1st Cir. 1998) (holding that requiring public spectators to present identification before entering the courtroom did not violate the Sixth Amendment right to public trial, where defendants were associated with past efforts to obstruct fair fact finding, and where members of the public actually attended).[3]

**B.**

Because the circumstances regarding the alleged courtroom closure in this case are not reflected in the official trial transcript, the district court held an evidentiary hearing on Bucci's claim to determine the relevant facts.  During the hearing,

---

[2] See also United States v. Agosto-Vega, 617 F.3d 541, 547-48 (1st Cir. 2010) (applying the Waller test and finding a Sixth Amendment violation where there was a "total exclusion of members of the public . . . from the jury voir dire process"); Owens, 483 F.3d at 66 (same).

[3] See also Garcia v. Bertsch, 470 F.3d 748, 752-53 (8th Cir. 2006) ("[W]here a trial judge orders a partial closure . . . ., courts have required only a 'substantial reason' for the partial closure, instead of the more stringent 'overriding interest' required by Waller."); United States v. Smith, 426 F.3d 567, 572 (2d Cir. 2005) (same); Judd v. Haley, 250 F.3d 1308, 1315 (11th Cir. 2001) (same); United States v. Osborne, 68 F.3d 94, 98-99 (5th Cir. 1995) (same); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir. 1989) (same); United States v. Sherlock, 962 F.2d 1349, 1357 (9th Cir. 1989) (same).

the district court heard testimony from members of the courtroom staff, members of the appellants' families, and Bucci's trial counsel. Below, we summarize the district court's findings of fact and the record of the hearing.

Jury empanelment for the Bucci-Jordan criminal trial was scheduled to take place on March 20, 2006, in courtroom 11 of the John Joseph Moakley Courthouse. Judge Lindsay presided over the trial. Courtroom 11 is the only courtroom in the building equipped with a mechanical lift, which, because he was wheelchair bound, Judge Lindsay required in order to get onto the bench. Courtroom 11 contains fourteen benches in its public seating area, each of which can comfortably seat four people for a normal capacity of fifty-six. At a maximum capacity of five per bench, the public area of courtroom 11 can seat seventy people.

Because the Bucci-Jordan trial involved two defendants, one of whom was a police officer, courtroom deputy clerk Lisa Hourihan ("Ms. Hourihan") arranged for a larger venire than usual. After discussing the matter with Judge Lindsay, Ms. Hourihan ordered a sixty-five juror venire.

On March 20, 2006, the doors to courtroom 11 were unlocked prior to 9:00 a.m. Before the proceedings began, approximately twelve to twenty-five members of the public took seats in the public area of the courtroom. Included in this group were Bucci's mother, Rosemarie Keefe ("Mrs. Keefe"); Bucci's wife,

Melissa Bucci ("Mrs. Bucci"); Jordan's wife ("Mrs. Jordan"); and Bucci's paralegal, Michael Kevin Dupont ("Dupont"). Between 9:00 a.m. and about 10:40 a.m., the courtroom staff and counsel for the government and both defendants were in the courtroom engaged in preparing for the proceedings. Judge Lindsay and the jury venire were not yet present in the courtroom during this time.

When the venire was ready to enter, Ms. Hourihan realized that courtroom 11, which had a maximum capacity of seventy spectators, could not seat the entire sixty-five person jury venire if more than a dozen members of the public occupied seats. Thus, in accordance with Judge Lindsay's past practice, Ms. Hourihan left her desk in front of the judge's bench, went to the public area of the courtroom, and asked that all members of the public clear the courtroom to make way for the jury.

As the members of the public exited the courtroom, Bucci's paralegal Dupont protested the courtroom closure and informed Ms. Hourihan that Bucci's family members had a right to be present during jury selection. Dupont was a well-known and frequent pro se litigant who had been hired by the Bucci family to take notes and provide insight during the trial. Dupont was not employed by Bucci's counsel. In response to Dupont's objection, Ms. Hourihan exited the courtroom through the back doors and consulted Judge Lindsay, who instructed her to accommodate Dupont's request. Ms. Hourihan accordingly went back into the courtroom and

-11-

cleared a bench in the front row (which was usually kept vacant because an audio/video podium blocked it from the judge's line of sight). Ms. Hourihan then exited the courtroom through the front doors and specifically invited Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan to return and sit at the newly-cleared bench in the front row.

After Mrs. Keefe, Mrs. Bucci, and Mrs. Jordan took their seats, the sixty-five members of the jury venire were escorted into the courtroom and seated five to a bench at each of the remaining empty benches. At that point, the fourteen-bench courtroom consisted of thirteen benches entirely filled with prospective jurors (five per bench) and the fourteenth bench containing Mrs. Keefe, Mrs. Bucci, Mrs. Jordan, and two empty seats. Two additional members of the public thus could have been seated.

Ms. Hourihan thereafter called the court to order, Judge Lindsay entered and took the bench, and the official transcript of the proceedings began at 10:40 a.m. Judge Lindsay proceeded to conduct the jury empanelment by first filling the jury box with prospective jurors starting with those seated in the first row of the public area. As those in the jury box were excused for cause, Judge Lindsay would replace the excused jurors with those next in line. This method resulted in the spectator benches being emptied sequentially from front to back.

Though at least 21 seats became available as prospective jurors were excused, members of the public were not invited to fill the newly-vacated seats. One or two court security officers stood outside the courtroom's doors and denied entry to all who attempted to enter. Excluded members of the public included friends and family members of the defendants, Bucci's paralegal Dupont, and, apparently, a Malden Police internal affairs investigator and a newspaper reporter. The security officers informed at least some members of the public that the courtroom would be closed all day. The district court found that the officers believed they were carrying out Ms. Hourihan's earlier directive to clear the courtroom.

At approximately 1:15 p.m., the court took a lunch recess. Jury selection resumed at approximately 2:15 p.m., and there were no further efforts by any court personnel to bar members of the public from entering the courtroom. Neither of the defendants' counsel objected at trial to the courtroom closure.

## C.

Judge Lindsay became ill and died, and a new judge was assigned to preside over the § 2255 hearings. The district court on collateral review noted that there was "a very real legal question" as to whether Bucci could show "cause" for his procedural default in failing to object to the courtroom closure, but the court declined to address the issue and went "on to analyze the

substance of the case on the assumption that . . . cause for [any] default has been adequately shown." Tr. of Evidentiary Hr'g at 94, Bucci v. United States, No. 04-10194-RCL (D. Mass. Oct. 22, 2009), ECF No. 442.

The court concluded that, because "three members of the public were present when jury empanelment began," the fact "[t]hat other members of the public were not allowed into the courtroom [did] not amount to a closure implicating the Sixth Amendment," even though two seats in the courtroom initially remained available and were not permitted to be filled by members of the public. Bucci, 677 F. Supp. 2d at 414.

The court also found no Sixth Amendment violation in the fact that the court security officers "continued to prohibit members of the public from entering the courtroom even as seats became available." Id. at 415. In the district court's view, this continued closure was within "the trial judge's power to place reasonable time, place, and manner limits on trial access." Id. The court further reasoned that "[t]he presence of the defendants' closest family members vindicated their public trial rights by ensuring that the defendants were 'fairly dealt with and not unjustly condemned' and by 'keep[ing] [the defendants'] triers keenly alive to a sense of their responsibility and to the importance of their functions." Id. at 416 (second and third alterations in original) (quoting Waller, 467 U.S. at 46).

-14-

The district court further found that there were other justifications for the partial courtroom closure, including the risk that the public would intermingle with the prospective jurors and might block counsels' view of the venire--concerns that did not in fact initiate the closure.

Accordingly, the district court denied Bucci's Sixth Amendment claim asserted in his § 2255 petition.

**D.**

Bucci correctly points out that the courtroom closure here likely violated the Sixth Amendment. Because this case involves a partial, as opposed to a total, courtroom closure, the first <u>Waller</u> factor requires only a "substantial" interest justifying the courtroom closure, rather than a "'compelling' interest." <u>DeLuca</u>, 137 F.3d at 33-34. However, even under this less stringent standard, it is difficult to see a substantial justification for the courtroom closure.

While space limitations can constitute a substantial justification for limiting the number of spectators admitted,[4] the

---

[4] <u>See, e.g.</u>, <u>United States</u> v. <u>Shryock</u>, 342 F.3d 948, 974 (9th Cir. 2003) (rejecting argument that limited seating in an otherwise open courtroom amounted to a "<u>de facto</u> closed courtroom" (internal quotation marks omitted)); <u>United States ex rel. Laws</u> v. <u>Yeager</u>, 448 F.2d 74, 81 (3d Cir. 1971) ("[T]he Sixth Amendment . . . limits the trial judge to the exclusion of those persons or classes of persons only whose particular exclusion is <u>justified by lack of space</u> or for reasons particularly applicable to them.") (emphasis added) (quoting <u>United States</u> v. <u>Kobli</u>, 172 F.2d 919, 923 (3d Cir. 1949)) (internal quotation marks omitted).

-15-

courtroom here at all times had multiple empty seats which could have been made available to the public. Two spectator seats on the benches were available when voir dire began. Also, at the outset, 12 jurors could have been seated in the jury box, thus immediately freeing up a like number of spaces for spectators. At least 21 more seats became available as prospective jurors were excused. As this court explained in Owens, "once there was sufficient space in the courtroom, we see no state interest--compelling or otherwise-- in not permitting [the defendant's] family, friends, or other members of the public to observe the proceedings." 483 F.3d at 62 (footnote omitted). Moreover, even if the courtroom were completely filled with prospective jurors, it would likely not justify the closure in this case. The Supreme Court in Presley made clear that alternative methods of increasing the available public seating, such as splitting the venire, must be adopted if reasonable. 130 S. Ct. at 725.

Nor could the § 2255 district court's alternative theories support closure. The district court found the closure justified because it "lessened the risk of intermingling between potential jurors and the defendants' close family members." Bucci, 677 F. Supp. 2d at 416. However, the Supreme Court expressly rejected the justification of preventing juror-public intermingling because this "generic risk" is "inherent" to every voir dire proceeding. Presley, 130 S. Ct. at 725. The district court also

-16-

found that "allowing spectators immediately to take the seats of the excused jurors in the first and second rows would block Judge Lindsay's and counsels' view of the venirepersons next in line to fill the jury box." Bucci, 677 F. Supp. 2d at 417. The purported concern that members of the public would block Judge Lindsay's and counsels' view of the venire does not constitute a substantial justification. Nor, contrary to the government's argument, is this a case in which the denial of the public trial right could be characterized as "trivial."[5]

There is also a problem here with court personnel handpicking only select members of the defendants' families to remain in the courtroom while the general public was excluded. This court has recognized that "the same standard [regarding courtroom closures] applies to family members as to the general public." Owens, 483 F.3d at 62 n.12; see also Davis v. United

---

[5] See Peterson v. Williams, 85 F.3d 39, 42-44 (2d Cir. 1996) (holding that a brief and accidental continuation of a proper courtroom closure, which was not noticed by any of the participants, was too trivial to amount to a Sixth Amendment violation); see also United States v. Perry, 479 F.3d 885, 887-88, 890-91 (D.C. Cir. 2007) (finding closure trivial where the court excluded only the defendant's eight-year-old son based on the court's belief that viewing the trial was inappropriate and that his presence was intended as an appeal to juror sympathy); United States v. Ivester, 316 F.3d 955, 959-60 (9th Cir. 2003) (temporary exclusion of the public from the courtroom to question the entire jury to determine if they were concerned for their safety, in a narcotics trafficking case, was deemed "so trivial as to not implicate [the defendant's] Sixth Amendment rights"); Braun v. Powell, 227 F.3d 908, 919-20 (7th Cir. 2000) (exclusion of a single member of the venire not chosen for the jury deemed trivial).

States, 247 F. 394, 395 (8th Cir. 1917) ("It is not essential to the right of attendance that a person be a relative of the accused, an attorney, a witness, or a reporter for the press, <u>nor can those classes be taken as the exclusive representatives of the public.</u>") (emphasis added).

Nonetheless, we do not decide the merits of the Sixth Amendment claim. As we now discuss, we conclude that Bucci's Sixth Amendment claim has procedurally defaulted and that no "cause" has been shown that would excuse his default. We consider Jordan's claim later in the opinion.

**E.**

Collateral relief in a § 2255 proceeding is generally unavailable if the petitioner has procedurally defaulted his claim by "fail[ing] to raise [the] claim in a timely manner at trial or on [direct] appeal." <u>Berthoff</u> v. <u>United States</u>, 308 F.3d 124, 127-28 (1st Cir. 2002); <u>see also</u> <u>United States</u> v. <u>Frady</u>, 456 U.S. 152, 167-68 (1982). If a petitioner's claim has procedurally defaulted, collateral review under § 2255 will be available only if the petitioner can show both (1) "cause" for having procedurally defaulted his claim; and (2) "actual prejudice" resulting from the alleged error. <u>Frady</u>, 456 U.S. at 167-68.[6]

---

[6] A procedural default may also be excused by a showing of actual innocence. <u>See</u> <u>Bousley</u> v. <u>United States</u>, 523 U.S. 614, 622 (1998). Bucci has not attempted to make any such showing.

-18-

It is undisputed that Bucci's counsel did not object at trial to the courtroom closure. Nonetheless, Bucci contends that his claim has not procedurally defaulted for several reasons.

Bucci first contends that Dupont's objection at trial preserved the issue. While Dupont had been hired by Bucci's family to take notes, Dupont was not employed by Bucci's trial counsel. This court has held that, when a defendant is represented by counsel, motions and objections made by parties other than the defendant's counsel are not sufficient to preserve a claim of error on the defendant's behalf, absent a court-approved "hybrid representation." See United States v. Washington, 434 F.3d 7, 16 (1st Cir. 2006). Here, the district court did not approve any hybrid representation for Bucci that included Dupont. Dupont's objection therefore cannot be attributed to Bucci.

Bucci next argues that his Sixth Amendment claim was nonetheless preserved when he raised the issue for the first time on his direct appeal.[7] This court noted that the issue had not been raised at trial and declined to address it--even under the "plain error" standard--because "the Spartan record" was "inadequate to permit meaningful review." Bucci, 525 F.3d at 129. This court suggested that, if Bucci should choose to file a § 2255 petition, "the district court may hold an evidentiary hearing to

---

[7] Bucci raised the issue by filing a pro se motion. Though Bucci was represented by counsel, this court exercised its discretion to accept his pro se filing. Bucci, 525 F.3d at 129.

-19-

test the merits of [his] claim." Id. Far from finding that Bucci's Sixth Amendment claim was preserved, this court in Bucci's direct appeal found that it had not been properly raised at the trial court level.

Bucci contends that, even if this court on appeal did not explicitly find his Sixth Amendment claim preserved, the very act of raising the issue for the first time on his direct appeal itself preserved the claim and entitles him to "plain error" review on a subsequent § 2255 petition.

While this court has not yet considered this issue in relation to § 2255, this court has addressed essentially the same issue in the § 2254 context relating to habeas petitions by state prisoners. In Commonwealth v. Horton, 753 N.E. 2d 119, 127 (Mass. 2001), a defendant contended for the first time on direct appeal that his right to a public trial had been violated when the state trial court conducted jury voir dire in a private jury deliberation room, excluding members of the public. Because the defendant had not objected at trial, the Massachusetts Supreme Judicial Court found the issue forfeited and considered the defendant's claim only for "a substantial likelihood of a miscarriage of justice," id., which is a limited standard of review akin to the federal "plain error" standard. After exhausting his state appeals, the defendant filed a § 2254 petition in federal district court. See Horton v. Allen, 370 F.3d 75 (1st Cir. 2004). The district court "rejected

[the petitioner's § 2254] claim on procedural default grounds because defense counsel did not object at trial." Id. at 80. This court affirmed, reasoning that "[t]he [state supreme court] did review the claim for a 'substantial miscarriage of justice,' but this sort of limited review does not work a waiver of the contemporaneous objection requirement." Id. at 81 (internal citation omitted). Thus, the defendant's failure to object at trial triggered a procedural default which could be excused only by satisfying the "cause and prejudice" standard. Id. This court has since applied this rule in multiple § 2254 cases,[8] and many of our sister circuits have adopted the same approach.[9]

The Supreme Court made clear in Frady that procedural defaults in § 2255 cases are to be reviewed under the same "cause and actual prejudice" standard applied in § 2254 cases. See Frady, 456 U.S. at 164-67; see also Francis v. Henderson, 425 U.S. 536,

---

[8] See Lynch v. Ficco, 438 F.3d 35, 45 (1st Cir. 2006); see also Glacken v. Dickhaut, 585 F.3d 547, 550-51 (1st Cir. 2009); Obershaw v. Lanman, 453 F.3d 56, 68 (1st Cir. 2006) ("Where, as here, the state court finds forfeiture because of the defendant's failure to object at trial, the fact that it reviews for a 'substantial likelihood of a miscarriage of justice' does not constitute a waiver of the requirement that the defendant timely object."). But see Clarke v. Spencer, 582 F.3d 135, 143-44 (1st Cir. 2009) (finding procedural default avoided where, even though defendant failed to object at trial, the state appellate court waived the forfeiture and rejected his claim on the merits).

[9] See, e.g., Rocha v. Thaler, 619 F.3d 387, 403-04 (5th Cir. 2010) (collecting cases and noting that the First, Third, Fourth, Sixth, Seventh, Tenth, and Eleventh Circuits have adopted the same approach, while the Eighth and Ninth Circuits have held otherwise).

542 (1976); Davis v. United States, 417 U.S. 333, 344 (1974). Thus, we hold that a claim asserted in a § 2255 petition is procedurally defaulted if the defendant failed to object to the alleged error at trial, even if the defendant subsequently raised the issue on direct appeal under "plain error" review.[10]

Because we find that Bucci's Sixth Amendment claim was procedurally defaulted due to his failure to object to the courtroom closure at trial, in general Bucci would not be entitled to collateral relief under § 2255 unless he could show both (1) "cause" for having procedurally defaulted his claim; and (2) "actual prejudice" resulting from the alleged error. See Frady, 456 U.S. at 167-68. Bucci argues that he need not establish prejudice because a public-trial violation is a structural error. See Owens, 483 F.3d at 64. It is an open question, however, whether a partial public trial violation like the one here constitutes structural error. See Purvis v. Crosby, 451 F.3d 734, 740 (11th Cir. 2006); Carson v. Fischer, 4721 F.3d 83, 95 (2d Cir.

---

[10] We further note that, while the Supreme Court in Frady did not directly address this issue, the Court's choice of language implied that failure to object at trial can alone trigger a procedural default. The Court stated that the cause and prejudice standard must be satisfied "to obtain collateral relief based on trial errors to which no contemporaneous objection was made," 465 U.S. at 167-68 (emphasis added), implying that failure to object at trial was alone sufficient to trigger a default. The Court also referred to the petitioner's failure to object both at trial and on his direct appeal as a "double procedural default," id. at 168 (emphasis added), implying that each failure to object independently constituted a procedural default for which "cause and prejudice" need be shown.

2005). We need not decide the question because Bucci has failed to establish "cause" excusing his procedural default.

Bucci argues that the "cause" prong of this test is satisfied on grounds that his counsel's failure to object to the partial courtroom closure at trial constituted ineffective assistance of counsel. The Supreme Court has recognized that ineffective assistance of counsel can constitute cause sufficient to excuse a procedural default, but only if the representation was "constitutionally ineffective under the standard established in Strickland." Murray v. Carrier, 477 U.S. 478, 488 (1986) (citing Strickland v. Washington, 466 U.S. 668 (1984)). Under Strickland, the defense counsel's performance will be found constitutionally ineffective only if the defendant can show (a) that his counsel's performance was deficient; and (b) that he was prejudiced as a result of the deficient performance. 466 U.S. at 687. The prejudice prong here is the same as the prejudice requirement of the cause and prejudice standard. Even if the prejudice requirement were satisfied (a question we do not decide), a showing of deficient performance would still be necessary.

To establish deficient performance under Strickland, the defendant must show that his counsel's actions "fell below an objective standard of reasonableness." Id. at 688. The question is whether the counsel's performance fell "within the wide range of reasonable professional assistance" that a competent criminal

defense counsel could provide under "prevailing professional norms." Id. at 688-89. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). Judicial scrutiny of the defense counsel's performance is "highly deferential," and the defendant must overcome a "strong presumption . . . that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. The inquiry focuses on "the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington v. Richter, 131 S. Ct. 770, 790 (2011); see also Dugas v. Coplan, 428 F.3d 317, 328 n.10 (1st Cir. 2005); Cofske v. United States, 290 F.3d 437, 444-45 (1st Cir. 2002). The reviewing court is therefore "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (first alteration in original) (citation omitted) (internal quotation marks omitted).

Important interests are served by requiring contemporaneous objections to courtroom closures. As the Supreme Court has recognized, objecting to a procedural error at trial "can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome." Puckett v. United States, 129 S. Ct. 1423, 1428 (2009). Moreover, trial courts are "ordinarily in the

-24-

best position to determine the relevant facts and adjudicate the dispute" with respect to procedural errors. Id. In the courtroom closure context, a contemporaneous objection calls the Sixth Amendment issue to the trial court's attention and facilitates the court's consideration of the Waller factors, providing an opportunity for the court to articulate its reasoning on the record regarding the closure's justification, scope, and possible alternatives. Also, "the contemporaneous-objection rule prevents a litigant from 'sandbagging' the court--remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." Puckett, 129 S. Ct. at 1428. Any contrary rule could encourage defendants to "take their chances on a verdict of not guilty in . . . trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." Wainwright v. Sykes, 433 U.S. 72, 89 (1977); cf. McCleskey v. Zant, 499 U.S. 467, 491-92 (1991) ("[H]abeas corpus review may give litigants incentives to withhold claims for manipulative purposes and may establish disincentives to present claims when evidence is fresh.").

Nonetheless, in Owens, this court held that the defense counsel's failure to object to a complete courtroom closure for an entire day of jury selection "may show that [counsel's] performance fell below 'an objective standard of reasonableness.'" 483 F.3d at 63. And Owens concluded that "given that the courtroom was closed

to the public for an entire day," failure to object could not have been "sound trial strategy." Id. at 64. But unlike Owens, the present case involved only a partial courtroom closure. In such situations, we cannot conclude that the absence of a sound trial strategy should be presumed. In our view, two features distinguish a partial closure from a complete closure. A complete closure has a far more severe impact on the rights of the accused than a partial closure (as reflected in the difference between the "overriding interest" and "substantial reason" standards). See Waller, 467 U.S. at 48 (using the "overriding interest" standard for a complete closure); DeLuca, 137 F.3d at 32-35 (requiring only a "substantial" interest for a partial closure). Moreover, a complete closure is extremely difficult to justify, and an objection by counsel is not likely to divert attention and resources from other significant issues; in contrast, a partial closure is likely to involve weighing competing considerations and creates the prospect of protracted proceedings and the concomitant diversion, as discussed below. These differences suggest that, in complete closure situations, counsel's failure to object presumptively is an unsound trial strategy, whereas in partial closure situations, no such presumption is appropriate.

We consider the question of ineffective assistance under the particular facts of this case, free of any presumption. Here, Bucci's trial counsel testified that he had knowledge of the

partial closure. Even if reasonably competent counsel under the "prevailing professional norms" would have viewed the partial closure as a potential Sixth Amendment violation (an issue which we do not decide),[11] we think that, under the applicable objective standard, competent counsel could have knowingly and reasonably declined to raise the constitutional issue in this case because doing so would be a waste of the defense's time, energy, and resources.

A competent defense counsel is "entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Richter, 131 S. Ct. at 789. In doing so, a competent attorney can elect to "avoid activities that appear 'distractive from more important duties.'" Id. (quoting Bobby v. Van Hook, 130 S. Ct. 13, 19 (2009) (per curiam)). In other words, the Strickland standard for ineffective assistance "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." Rogers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994). Indeed, while criminal defendants are entitled to competent representation, the Constitution "does not insure that defense

_____

[11] Bucci's trial counsel was aware of the closure and stated at Bucci's § 2255 hearing that "it didn't occur to [him] to object" to the courtroom closure because "[i]t didn't occur to [him] that it was . . . improper to ask people to leave the courtroom during jury selection." Tr. of Evidentiary Hr'g at 65, Bucci v. United States, No. 04-10194-RCL (D. Mass. Oct. 14, 2009), ECF No. 436.

counsel will recognize and raise every conceivable constitutional claim." Engle v. Isaac, 456 U.S. 107, 133-34 (1982).[12]

Here, we think competent defense counsel could have reasonably concluded that the presence of Bucci's family members sufficiently mitigated the risk of actual prejudice to Bucci to the point that Bucci had little or nothing to gain from opening the courtroom to additional members of the public. In other words, we think that competent defense counsel in this case could have reasonably concluded that even a successful Sixth Amendment challenge to the partial courtroom closure would have done little to increase the defense's chances of securing a not-guilty verdict. As such, an objectively reasonable defense counsel could have made the strategic decision to forego the Sixth Amendment objection in favor of conserving the defense's limited resources for other important issues. Rather than raising a complicated constitutional issue that might require briefing and a hearing while offering limited upside to the defendant, the defense counsel could have

---

[12] See also Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998) (holding that "counsel could reasonably have decided to utilize his limited resources in investigating other avenues"); Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992) (finding no inadequate assistance in defense counsel's failure to object to admission of defendant's prior conviction, because "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources. Just as counsel is not obliged to advance every available nonfrivolous argument, so counsel is not necessarily ineffective for failing to investigate every conceivable matter inquiry into which could be classified as nonfrivolous." (citations omitted)).

reasonably believed his client's interests would be best served by moving the trial along and focusing on the immediate task of jury selection.

Under these circumstances, Bucci's counsel's failure to raise the objection at trial did not fall below the "objective standard of reasonableness" required to establish constitutionally ineffective assistance under Strickland. Bucci thus has not shown "cause" that excuses his procedural default. While we find the defense counsel's actions here were reasonable where the partial courtroom closure only occurred during part of the voir dire proceeding, we note that the reasonableness of counsel failing to object under other circumstances, such as partial closure of an entire trial, might present a quite different question.

**F.**

Bucci contends that the district court erred in conducting the § 2255 hearing in his absence, that his counsel was ineffective in failing to request his presence, and that he is entitled to a new § 2255 hearing. Because this issue was not raised before the district court, our review is for plain error. Rodriguez, 311 F.3d at 437. We reject these claims because we conclude that there was no error, plain or otherwise, in conducting the hearing without Bucci present.

Section 2255 provides that a district court "may entertain and determine such motion without requiring the

-29-

production of the prisoner at the hearing." 28 U.S.C. § 2255(c). Whether the petitioner should be present at his § 2255 hearing "depends upon the issues raised by the particular case," United States v. Hayman, 342 U.S. 205, 223 (1952), and is a matter left to the district court's sound discretion, Kent v. United States, 272 F.2d 795, 797 (1st Cir. 1959); see also Sanders v. United States, 373 U.S. 1, 21 (1963).

While Bucci was present when the courtroom closure occurred, he was not the only defense witness available to testify as to the events in question. At the § 2255 hearing, various members of the courtroom staff, Michael Natola (Bucci's trial counsel), Mrs. Keefe (Bucci's mother), and Richard Morganti (Jordan's brother-in-law) testified as to the events that occurred inside the courtroom. Bucci does not demonstrate, or even contend, that he had anything material to add to this testimony. The Supreme Court has recognized that "there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner," and that district courts have "discretion to exercise their common sense" as to such matters. Machibroda v. United States, 368 U.S. 487, 495 (1962). Here, the court could have "reasonably decided that [Bucci's] testimony . . . would add little or nothing" to the testimony of other available witnesses. Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001). The court did not abuse its discretion, much less

-30-

commit plain error, in holding the hearing without Bucci's being present.

### III. Jordan's Right to a Public Trial

We turn now to Jordan's case and the question of whether Jordan's claim, like Bucci's, is barred by his procedural default.

Because it is undisputed that Jordan failed to raise the courtroom closure issue either at trial or on his direct appeal, it is clear that his Sixth Amendment claim was procedurally defaulted. In addition to the prejudice requirement, there is a question of whether Jordan can satisfy the cause requirement. Frady, 456 U.S. at 167-68. In addition to asserting ineffective assistance of counsel as cause for his procedural default, Jordan asserts that "his counsel neither knew of nor had any reason to know of the [courtroom] closure." Jordan's Reply Br. 21. The government so far has been willing to assume that Jordan's counsel was unaware of the closure.[13] Jordan contends that his counsel's alleged

---

[13] The government states in its brief on the present appeal that, "apparently[,] . . . Jordan's attorney" "was not aware of [the closure]," Appellee's Br. 42, apparently relying on conversations with Jordan's counsel in the proceedings below, see Gov'ts Mot. for Summ. Dismissal at 3 n.1, Jordan v. United States, No. 04-CR-10194-WGY (D. Mass. July 29, 2009), ECF No. 415 (noting that "[u]ndersigned counsel has conferred with both of Jordan's trial counsel" and "[n]either recalls anything of the partial closure of the courtroom during jury selection"). The government further stated that "[t]his is not a case in which trial counsel should have known to be on the look-out for courtroom closure issues," and that "trial counsel did not have any reason to be particularly attentive to whether the courtroom clerk or the court security officers moved spectators out of the courtroom at the outset of jury selection." Id. at 5 n.3.

unawareness itself constitutes "cause" excusing his failure to object--even absent a showing of constitutionally ineffective assistance--because his unawareness was due to some "objective factor external to the defense." Jordan's Br. 37 (citing Murray, 477 U.S. at 488).

We note that, in view of the hearing testimony below, it may be questionable whether Jordan's counsel was unaware of the courtroom closure, given that Jordan's counsel was likely present in the courtroom and Ms. Hourihan testified that she announced the closure "[t]o everybody that was in the courtroom." Tr. of Evidentiary Hr'g at 17, Bucci v. United States, No. 04-10194-RCL (D. Mass. Oct. 14, 2009), ECF No. 436. If Jordan's counsel was present, Jordan may also have difficulty in showing that counsel's unawareness (if it existed) was caused by an "objective factor external to the defense," as would be required for attorney unawareness to constitute "cause." Murray, 477 U.S. at 488.[14] But

_____

[14] See also Burks v. Dubois, 55 F.3d 712, 717 (1st Cir. 1995) ("If inadvertence of counsel, without more, were deemed to constitute sufficient cause, the cause requirement would be reduced to little more than a speed bump on the road to a federal forum."); Magee v. Harshbarger, 16 F.3d 469, 472 (1st Cir. 1994) (rejecting claim of "cause" based on counsel's alleged unawareness of prejudicial evidence, because the court was "unable to find any 'external impediments' to trial counsel's failure to timely notice the allegedly prejudicial entry" and object to its admission).
We note that in Morales v. United States the Second Circuit held that if defense counsel were unaware of the courtroom closure, the failure to object could not constitute ineffective assistance. 635 F.3d 39 (2d Cir. 2011). We do not read Morales as addressing the question whether counsel's unawareness could excuse a procedural default of a public trial claim. Only an ineffective

we nonetheless conclude that Jordan is entitled to a new § 2255 hearing.

The § 2255 hearing below failed to address Jordan's allegations concerning "cause." While hearing testimony detailed the courtroom closure generally, Jordan's trial counsel did not testify, and no testimony focused on the whereabouts of Jordan's counsel during the events in question; counsel's unawareness of the closure; or, if counsel was unaware, whether his lack of awareness was caused by some "objective factor external to the defense." The government does not argue that the hearing that was conducted provided a sufficient basis for this court to reject Jordan's argument that his counsel's failure to object should be excused. Jordan is entitled to an evidentiary hearing on the cause issue, and to have counsel appointed pursuant to Rule 8(c) of the Rules Governing Section 2255 Proceedings. See 28 U.S.C. § 2255(b); United States v. Butt, 731 F.2d 75, 78 (1st Cir. 1984).

If Jordan can overcome the hurdle of his procedural default, Jordan contends he is also entitled to a new § 2255 hearing on the merits of his Sixth Amendment claim because he was not provided with counsel at the hearing.

Although petitioners have no constitutional right to counsel in § 2255 proceedings, Finley, 481 U.S. at 555-56, Rule

---

assistance claim was raised in Morales, not a public trial claim as such. See id. at 42.

8(c) of the Rules Governing Section 2255 Proceedings requires the appointment of counsel if an evidentiary hearing is required.  Rule 8(c) provides, in relevant part:

> If an evidentiary hearing is warranted, the judge <u>must appoint an attorney</u> to represent a moving party who qualifies [as an indigent] under 18 U.S.C. § 3006A.  The judge must conduct the hearing as soon as practicable after <u>giving the attorneys adequate time to investigate and prepare</u>.

Rules Governing § 2255 Proceedings 8(c) (2009) (emphasis added).  While the application of Rule 8(c) is an issue of first impression in the First Circuit, all of our sister circuits that have considered the issue have held that Rule 8(c) requires the court to appoint counsel for indigent petitioners if it holds a § 2255 evidentiary hearing, and the failure to do so constitutes structural error requiring automatic vacatur or reversal.[15]  We agree, and the government does not argue to the contrary.

However, the government contends that Jordan had no right to counsel under Rule 8(c), as to the merits of the public trial issue, because "the record establishes that the district court held a hearing [only] on Bucci's § 2255 motion, not Jordan's."

---

[15] See <u>Graham</u> v. <u>Portuondo</u>, 506 F.3d 105, 107 (2d Cir. 2007); <u>Green</u> v. <u>United States</u>, 262 F.3d 715, 718-19 (8th Cir. 2001); <u>Shepherd</u> v. <u>United States</u>, 253 F.3d 585, 588 (11th Cir. 2001); <u>United States</u> v. <u>Iasiello</u>, 166 F.3d 212, 214 (3d Cir. 1999); <u>United States</u> v. <u>Duarte-Higareda</u>, 68 F.3d 369, 370 (9th Cir. 1995); <u>Swazo</u> v. <u>Wyo. Dep't of Corr. State Penitentiary Warden</u>, 23 F.3d 332, 333-34 (10th Cir. 1994); <u>United States</u> v. <u>Vasquez</u>, 7 F.3d 81, 85 (5th Cir. 1993); <u>Rauter</u> v. <u>United States</u>, 871 F.2d 693, 695-97 (7th Cir. 1989).

Appellee's Br. 16. In other words, the government contends that the evidentiary hearing conducted by the court pertained only to Bucci's case, and that Jordan's case was decided based on the record of Bucci's hearing.

While the district court characterized the hearing as being limited to Bucci's claim, a proceeding which in substance "clearly resemble[s] an evidentiary hearing" on a petitioner's claim amounts to an "evidentiary hearing" within the meaning of Rule 8(c), "despite the district court's unwillingness to categorize it as such." Shepherd, 253 F.3d at 587. Here, we find that the substance of the proceeding below--which related to both defendants' voir dire, included testimony from both defendants' relatives, and resulted in judgment against both parties--clearly indicates that the court held a Rule 8(c) "evidentiary hearing" on the merits of both Bucci's and Jordan's claims. Jordan was therefore entitled to have appointed counsel in connection with the hearing. The hearing below as to the merits of his Sixth Amendment claim "must be treated as a nullity, and the court's findings disregarded." Kent, 272 F.2d at 797.

In short, Jordan is entitled to a hearing (and counsel) to consider the issues of "cause" and "prejudice" for his procedural default. If Jordan can overcome his procedural default, he is entitled to a new hearing as to the merits of his Sixth Amendment claim. The district court, if it so elects, may combine

these two hearings.  We accordingly vacate the district court's dismissal of Jordan's § 2255 petition and remand Jordan's case for further proceedings consistent with this opinion.

## IV. Article III

In addition to their Sixth Amendment claims, both Bucci and Jordan alternatively assert for the first time on the present appeals that an improper delegation of Article III authority occurred when the courtroom closure was effectuated by Ms. Hourihan (the clerk) rather than by Judge Lindsay himself.

We first note that there is a substantial question as to whether the appellants' Article III claims are properly before this court, as they were not asserted in the appellants' § 2255 petitions; were not addressed by the district court below; and were not included in the appellants' Certificates of Appealability ("COA").[16]  Moreover, neither Bucci nor Jordan raised an Article III objection at trial or on direct appeal, so the same procedural default issues discussed above regarding the appellants' Sixth Amendment claims are present here.  However, we need not decide

---

[16] See 28 U.S.C. § 2253(c)(1)(B), (3) (requiring a COA denoting the "specific [appealable] issue or issues" before an appeal can be taken from a final disposition of a § 2255 petition); Peralta v. United States, 597 F.3d 74, 83 (1st Cir. 2010) ("[A] court of appeals should not consider the merits of an issue advanced by a habeas petitioner unless a COA has first been obtained with respect to that issue." (citation omitted) (internal quotation marks omitted)).

these procedural issues, because we find that the appellants' Article III claims lack merit.

The question presented is whether, in the absence of a contemporaneous objection by trial counsel to a partial courtroom closure, a judge commits an impermissible delegation of Article III authority if he authorizes his staff to regulate public attendance and does not address the Waller factors sua sponte on the record. We hold that the delegation of administrative tasks regarding courtroom seating does not violate Article III.

It is well settled that, "[w]hile '[c]ases or controversies committed to Art. III courts cannot be delegated to nonjudicial officers for resolution[,] [t]hat general principle does not . . . prohibit courts from using nonjudicial officers to support judicial functions, as long as that judicial officer retains and exercises ultimate responsibility.'" United States v. Allen, 312 F.3d 512, 515-16 (1st Cir. 2002) (alterations in original) (quoting United States v. Johnson, 48 F.3d 806, 809 (4th Cir. 1995)); see also United States v. Raddatz, 447 U.S. 667, 683 (1980) (holding that, "so long as the ultimate decision is made by the district court," the delegation of authority to a magistrate to hold an evidentiary hearing and to make proposed factual findings and legal recommendations does not violate Article III).[17]

_____

[17] See also United States v. York, 357 F.3d 14, 21-22 (1st Cir. 2004); Allen, 312 F.3d at 515-16 (both holding that probation officer's role in determining details of court ordered psychiatric

-37-

Here, the record shows that Judge Lindsay was responsible for the decision as to whether to close the courtroom. The district court on collateral review found that Ms. Hourihan "was following Judge Lindsay's instructions" when she asked the public to clear the courtroom, "as [it] was the practice in that session of the Court" to close the courtroom when an oversized venire would require most of the public seating. Tr. of Evidentiary Hr'g at 86-87, Bucci v. United States, No. 04-10194-RCL (D. Mass. Oct. 22, 2009), ECF No. 442. The court further found that, after Dupont objected and contended that "Mr. Bucci's wife and mother" had a right to be present, Ms. Hourihan "went back to consult Judge Lindsay and Judge Lindsay . . . accommodated them by directing her to bring them in and seat them in row 11." Id. at 87-88.

It is thus clear that, at all times, Judge Lindsay was responsible for the decision to close the courtroom, and he merely delegated the administrative details. If the defendants had properly objected to the partial courtroom closure at trial, we are confident that Judge Lindsay--not Ms. Hourihan--would have weighed the Waller factors and made a determination as to the closure's

---

testing does not violate Article III). But see United States v. Melendez-Santana, 353 F.3d 93, 101 (1st Cir. 2003) (finding an Article III violation where the district court gave a probation officer "discretion" to determine not only the details of the defendant's drug treatment, but also whether the defendant would be required to undergo such treatment), overruled, in part, on other grounds by United States v. Padilla, 415 F.3d 211, 215 (1st Cir. 2005) (en banc).

constitutionality.  We merely hold that, having made the decision to close the courtroom partially, the court's delegation of administrative details regarding the closure to his staff did not violate Article III.

## V. Prosecutorial Misconduct

We turn next to Bucci's claims of prosecutorial misconduct.  Necessary to an understanding of Bucci's claims is a brief description of the theory the prosecution asserted at trial.

Bucci was charged and convicted of carrying a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).  Because only officer Jordan carried a firearm during the robbery, the government sought to convict Bucci for the firearm charge by invoking the Pinkerton theory of vicarious conspiratorial liability, under which "members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy." United States v. Rivera-Rodriguez, 617 F.3d 581, 596 (1st Cir. 2010) (citation omitted); see also Pinkerton v. United States, 328 U.S. 640 (1946). Thus, to establish Bucci's guilt as Jordan's co-conspirator with respect to the firearm charge, the government had the burden of proving beyond a reasonable doubt that Bucci could have reasonably foreseen that Jordan would carry a firearm during the robbery.  To that end, the prosecution enlisted Minotti--one of Bucci's co-conspirators who pled guilty--to testify at Bucci's trial that he

(Minotti) reasonably foresaw that Jordan would carry a firearm during the robbery. The government's apparent theory was that, if Jordan's carrying a firearm were reasonably foreseeable to Minotti, it would also have been reasonably foreseeable to Bucci. Any error in admitting Minotti's testimony is not at issue in this § 2255 proceeding.

The Pinkerton theory also played a role in Bucci's sentencing enhancement. Pursuant to 18 U.S.C. § 924(c)(1)(A)(i)-(ii), the mandatory minimum sentence for carrying a firearm during the commission of a drug trafficking crime is increased from five years (60 months) to seven years (84 months) if the firearm was brandished during the commission of the crime. It being undisputed that Jordan brandished his firearm during the robbery, the prosecution sought to add the brandishing enhancement at Bucci's sentencing hearing. The district court agreed, finding that Bucci could have reasonably foreseen that Jordan would draw his firearm.

Bucci first contends that the prosecution committed Brady violations by withholding two statements made by Minotti, the co-conspirator that testified against Bucci. The first of these statements was pertinent only to Bucci's sentence enhancement, as it was not made until after Bucci's trial. After Bucci was convicted, but before he was sentenced, Minotti submitted an affidavit ("Sentencing Affidavit") to his own sentencing judge (a different judge than Bucci's). In his Sentencing Affidavit,

-40-

Minotti stated that the conspirators met in the Malden Medical Center parking lot at about 9:00 a.m. on the morning of the robbery to discuss the details of their plan. At the meeting, Jordan allegedly asked Minotti if Ruiz (the target) carried a firearm, and Minotti allegedly informed Jordan that Ruiz never did. Bucci alleges that the prosecution failed to disclose this affidavit to the defense and that it constituted material exculpatory evidence.[18]

However, the affidavit is in large part cumulative of other evidence the prosecution did submit to Bucci detailing the exact same conversation. In connection with his plea agreement, Minotti disclosed the details of his conversation with Jordan during several proffer sessions with the government. The prosecution provided the government's notes of these interviews to Bucci during discovery. The disclosed pieces of evidence contain substantially the same information concerning the Minotti-Jordan conversation as did Minotti's Sentencing Affidavit--i.e., that the conspirators had a 9:00 a.m. meeting at the Malden Medical Center, and that Minotti informed Jordan at the meeting that Ruiz would

---

[18] At Minotti's sentencing, the government recognized that it "ha[d] an obligation to disclose [the Sentencing Affidavit] to the other defendants in this case." Tr. of Sentencing at 6, United States v. Minotti, No. 04-10325-GAO (D. Mass. July 13, 2006), J.A. 362, 367. There is no evidence that this occurred. But we note that Minotti's Sentencing Affidavit became part of the public record prior to Bucci's sentencing hearing. See Bucci, 677 F. Supp. 2d at 418 n.12; see also Docket Sheets, Minotti, No. 04-10325-GAO (motion to seal sentencing affidavit, ECF No. 67, denied on July 14, 2006); Tr. of Sentencing, United States v. Bucci, No. 04-10194-RCL (D. Mass. Nov. 15, 2006), J.A. 188.

likely be unarmed. Both the Sentencing Affidavit and the disclosed proffer materials are unclear as to whether Bucci overheard the conversation between Minotti and Jordan. Bucci appears to concede that the Sentencing Affidavit is cumulative insofar as it describes the meeting, but he nonetheless argues that the Sentencing Affidavit "'went beyond the discovery materials' in stating that it was [Minotti's] subjective belief that Jordan would not draw his gun." Bucci's Reply 33-34. Specifically, the Sentencing Affidavit stated:

> It . . . never dawned on me that Jordan would even consider pulling his service weapon. It was not part of any plan and it would be plainly unnecessary. I expected that at most Jordan would simply identify himself as a police officer and inquire as to what was going on.

Aff. of John Minotti at 4, <u>Minotti</u>, No. 04-10325-GAO (D. Mass. July 11, 2006), J.A. 425, 428.

Bucci points to another alleged item of <u>Brady</u> material--a statement Minotti allegedly made during one of his proffer sessions with the government wherein he allegedly stated that he did not reasonably foresee Jordan would carry a firearm during the robbery.[19] This portion of the proffer session (if it existed) was

---

[19] Minotti's statement does not appear in the government's notes documenting his proffer sessions. Rather, for proof that Minotti made such a statement, Bucci relies on an affidavit Minotti himself submitted to Bucci's § 2255 counsel long after Bucci was convicted ("Post-Conviction Affidavit"), apparently seeking to aid Bucci in his § 2255 petition. In the Post-Conviction Affidavit, Minotti asserts that he initially told prosecutors he did not

not made available to Bucci.  Because Minotti allegedly made this prior inconsistent statement before Bucci's trial, it was potentially pertinent to both Bucci's conviction and sentence enhancement.

The question is whether the government was obligated to disclose Minotti's two statements under Brady v. Maryland, 373 U.S. 83, 87 (1963).  In Brady, the Supreme Court held that the government's suppression of evidence favorable to the accused violates due process if the evidence is material to guilt or punishment.  To prevail on a Brady claim, "petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)."  Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

To satisfy the prejudice (i.e., materiality) prong of the Brady analysis, the petitioner must show there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280; see also United States v. Celestin, 612 F.3d 14, 23 (1st Cir. 2010).  A "reasonable probability" exists if

_____

foresee Jordan's possession of the firearm, but then later changed his position in order to meet the prosecution's plea demands.

the evidentiary suppression "undermines confidence in the outcome of the trial."  Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also United States v. Avilés-Colón, 536 F.3d 1, 20 (1st Cir. 2008). Moreover, "[s]uppressed evidence that is merely cumulative of evidence already in the defendant's possession does not justify a new trial."  United States v. Turner, 501 F.3d 59, 73 (1st Cir. 2007) (citing Conley, 415 F.3d at 189).[20]

We find that Bucci has failed to show prejudice.  The use of a prior inconsistent statement to impeach Minotti's trial testimony as to the issue of foreseeability would likely have had little bearing on Bucci's guilt or innocence.  Minotti's subjective opinion that it was reasonably foreseeable that Jordan might carry a firearm is of dubious relevance to whether it was objectively foreseeable to Bucci.  Even without Minotti's testimony as to the gun's foreseeability, the circumstances of the robbery alone provide overwhelming evidence that anyone in Bucci's position could have reasonably foreseen that officer Jordan might carry his service firearm during the robbery.  These circumstances include

---

[20] Because Bucci did not raise his present Brady claims on his direct appeal, he must show "cause and actual prejudice" excusing his procedural default.  See Frady, 456 U.S. at 167-68.  This is of little moment, however, because as the Supreme Court has recognized, the "cause and prejudice" test "parallel[s] two of the three components of the alleged Brady violation itself"--i.e., the prosecution's suppression itself can constitute "cause" for failing to object, and the "prejudice" prongs of both tests require a "reasonable probability" that the result would have been different. Strickler, 527 U.S. at 282; see also Rocha v. Thaler, 619 F.3d 387, 394 (5th Cir. 2010).

the facts that (a) Bucci knew that Jordan was an actual police officer, and police officers often carry guns; (b) the conspirators' plan involved Jordan's playing the role of a police officer performing a drug bust; (c) Ruiz might not have believed Jordan was a police officer if Jordan arrived at the scene unarmed; and (d) even if everyone expected Ruiz to be unarmed, the possibility still existed that Jordan might need a gun for protection if Ruiz became physically violent when faced with the threat of losing over $80,000 worth of his cocaine.

Under these circumstances, we do not find any "reasonable probability" that the mere impeachment of Minotti's subjective opinion testimony would have caused the jury to instead find it unforeseeable that officer Jordan might carry a gun during the robbery. The possible suppression of Minotti's alleged prior inconsistent statement does not "undermine[] [our] confidence in the outcome of [Bucci's] trial." Kyles, 514 U.S. at 434.

Similarly, given the court's reasoning for applying the brandishing enhancement, we find it even more unlikely that Minotti's Sentencing Affidavit would have changed the result of Bucci's sentencing. In finding that it was "entirely foreseeable" that Jordan would brandish his firearm during the robbery, the district court focused heavily on the fact that Jordan had to make the fake drug "bust" look believable to Ruiz, their target. The court reasoned that the success of the conspirators' plan hinged on

Jordan's ability to "make [the robbery] seem like a real police encounter."  Tr. of Sentencing at 22, United States v. Bucci, No. 04-10194-RCL (D. Mass. Nov. 15, 2006), J.A. 188, 209.  Ruiz did not know that Bucci and Minotti were working with Jordan.  Rather, from Ruiz's perspective, Jordan was merely a single man--wearing plain clothes and driving an unmarked car--who decided to interrupt a large drug deal.  In the sentencing court's view, it was reasonably foreseeable that Jordan would pull out his gun "to convince this guy, Ruiz, . . . that he's a police officer" when confronting three hardened criminals without backup.  Id. at 22; J.A. 211.

In view of the sentencing court's reasoning, we do not find any "reasonable probability" that the court would have instead found Jordan's brandishing unforeseeable if it had been presented with Minotti's prior statements.  Even if Jordan believed that Ruiz would be unarmed, this would have little relevance to Bucci's state of mind.  The court's reasoning that Jordan would likely pull out his firearm to make the ruse look believable would still apply.

Accordingly, because Bucci has failed to show that he was prejudiced by the alleged suppression of either of Minotti's statements, we reject Bucci's Brady claims.

Bucci next contends that the prosecution knowingly elicited perjured testimony from Minotti when it had him testify against Bucci at trial that he reasonably foresaw Jordan would carry a firearm.  A conviction can be reversed on subordination of

perjury grounds only if the petitioner can show: (1) that the prosecution elicited false testimony; (2) that the prosecution knew or reasonably should have known that the testimony was false; and (3) that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." Perkins v. Russo, 586 F.3d 115, 119 (1st Cir. 2009) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Here, Bucci has failed to show that Minotti's testimony was false.

Bucci contends that Minotti's testimony that he reasonably foresaw Jordan would carry a gun was false because Minotti allegedly first took the opposite position during his proffer sessions with the government, as detailed in Minotti's Post-Conviction Affidavit. However, even if Minotti did initially adopt an a no-foreseeability position during his proffer sessions, it would not establish the falsity of his later testimony. Minotti could have lied when he told the prosecution that he did not foresee that Jordan would carry a firearm, and yet testified truthfully at Bucci's trial that he actually did foresee the gun. As this court has held, "the fact that a witness contradicts herself or changes her story does not establish perjury" and "do[es] not create an inference, let alone prove, that the prosecutor knowingly presented perjured testimony." United States v. Lebon, 4 F.3d 1, 1 (1st Cir. 1993) (quoting Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991)) (internal quotation mark

omitted).[21]   Thus, because Bucci has failed to establish that Minotti testified falsely at Bucci's trial, we reject Bucci's claim that the prosecution knowingly subordinated perjury.

In like vein, Bucci contends that the prosecution improperly coerced Minotti to testify against Bucci, and to change his subjective position regarding the foreseeability of Jordan's carrying a firearm, by extending Minotti an offer of leniency. This allegation is based on Minotti's Post-Conviction Affidavit, which alleges nothing more than that he felt compelled to testify and change his position regarding the firearm's foreseeability in order to secure a plea agreement.  It is well settled that a prosecutor's threat to pursue more serious charges or sentencing supported by probable cause does not amount to improper coercion.[22] We accordingly reject Bucci's coercion claim.

---

[21] See also United States v. Doherty, 867 F.2d 47, 70 (1st Cir. 1989) (finding no decision that "prohibits a prosecutor from calling witnesses who will present conflicting stories"); United States v. Hemmer, 729 F.2d 10, 17 (1st Cir. 1984) ("Simply because there exist[] inconsistencies between [a witness's] grand jury and trial testimony does not warrant the inference that the government knowingly introduced perjurious testimony.").

[22] See Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978) (finding no Due Process violation where prosecutor threatened to charge defendant with a more serious crime if he did not accept a plea, because the prosecutor did "no more than openly present[] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution"); United States v. Jenkins, 537 F.3d 1, 4 (1st Cir. 2008) (finding no Due Process violation because "[h]ere, as in Bordenkircher, the prosecutor tried to induce a plea by agreeing to lenient treatment for defendant").

## VI. Conclusion

For the foregoing reasons, we affirm the district court's denial of Bucci's § 2255 petition, vacate the district court's denial of Jordan's § 2255 petition, and remand Jordan's case for further proceedings consistent with this opinion.

Affirmed in part, vacated in part, and remanded.